## NEW ENGLAND SAVINGS BANK *v.* BEDFORD REALTY CORPORATION ET AL.
### (15235)

Callahan, Borden, Berdon, Norcott and Palmer, Js.

Argued April 26—officially released August 13, 1996

*J. Michael Sulzbach,* for the appellant (named defendant).

*Charles D. Houlihan, Jr.,* for the appellee (plaintiff GHR D.C., Inc.).

NORCOTT, J. The named defendant, Bedford Realty Corporation (Bedford), appeals from a judgment of strict foreclosure rendered by the trial court in favor of the plaintiff, GHR D.C., Inc. (GHR).[1] Bedford claims that the trial court improperly: (1) admitted certain evidence at trial; (2) determined that the named plaintiff mortgagee was entitled to accelerate the mortgage debt; and (3) determined that GHR was not required to satisfy the requirements of General Statutes §§ 42a-3-301 and 42a-3-309,[2] governing the enforcement of a lost instru-

[1] The plaintiff at the time this appeal was filed was GHR D.C., Inc. Although this court subsequently granted a motion to substitute Alaska Seaboard Partners Limited Partnership as party plaintiff, references in this opinion are to GHR as the plaintiff.

[2] General Statutes § 42a-3-301 provides: "Person entitled to enforce instrument. 'Person entitled to enforce' an instrument means (i) the holder of the instrument, (ii) a nonholder in possession of the instrument who has the rights of a holder, or (iii) a person not in possession of the instrument who is entitled to enforce the instrument pursuant to section 42a-3-309 or 42a-3-418(d). A person may be a person entitled to enforce the instrument even though the person is not the owner of the instrument or is in wrongful possession of the instrument."

General Statutes § 42a-3-309 provides in relevant part: "Enforcement of lost, destroyed or stolen instrument. (a) A person not in possession of an instrument is entitled to enforce the instrument if (i) the person was in possession of the instrument and entitled to enforce it when loss of possession occurred, (ii) the loss of possession was not the result of a transfer by the person or a lawful seizure, and (iii) the person cannot reasonably obtain possession of the instrument because the instrument was destroyed, its whereabouts cannot be determined, or it is in the wrongful possession of an unknown person or a person that cannot be found or is not amenable to service of process. . . ."

ment. We reverse and remand the case to the trial court for a new trial.

The relevant facts are as follows. In August, 1986, Stelle M. Mahler obtained a mortgage loan in the amount of $372,000 from the named plaintiff, New England Savings Bank (New England). At that time, Mahler executed a note evidencing her promise to repay the loan and executed a mortgage deed to New England on her residence in Madison. In 1991, Mahler transferred the mortgaged property to Bedford, as a result of which, New England accelerated the loan, claiming that the transfer violated a nontransfer clause in the mortgage deed.

In September, 1992, New England brought this action for foreclosure, alleging that Mahler had transferred the property in violation of the mortgage and had failed to make payments on the debt secured by the mortgage. In October, 1992, the trial court, *Dorsey J.*, defaulted Bedford for failing to disclose its defenses to New England's allegations, at which point New England moved for strict foreclosure. Subsequently, Bedford filed a motion to set aside the default judgment. The trial court denied the motion to set aside the judgment. Thereafter, the trial court granted New England's motion for a judgment of strict foreclosure, and set a hearing date to determine the exact amount of the outstanding debt and to set law days.

At a hearing in damages before Judge Dorsey in May, 1993, Bedford requested that the trial court reconsider its ruling denying Bedford's motion to set aside the default. The trial court did not immediately act upon the request. New England then called Sandra Reid, an assistant vice president and loan collections manager of the bank, to establish the amount due on the debt. New England introduced Reid's affidavit of debt, in which she attested to the current debt owed and its

components.[3] Reid testified that she had prepared the affidavit from bank records and that the amounts stated in the affidavit were accurate. Specifically, she testified that she had determined the amount of principal from certain computer records maintained by the "pay off" department at New England, and that she had manually calculated the interest to "prove" the records on which she had relied. The mortgage deed, which was also introduced into evidence, also referred to the interest rate. Reid did not manually calculate the escrow or late charges. Bedford objected both to the admission of the affidavit and to Reid's testimony as to the amount of the debt, arguing that both were hearsay because they were based on documents not in evidence. The trial court overruled Bedford's objections.[4]

One week after the adjournment of the hearing in damages, New England became insolvent and the Federal Deposit Insurance Corporation (FDIC), was appointed as receiver of New England's assets. The FDIC assigned New England's interest in the mortgage loan executed by Mahler to Citizens Savings Bank (Citizens), which was substituted for New England as the party plaintiff. Thereafter, Citizens assigned its interest in the mortgage and the note to GHR. GHR was then substituted for Citizens as the party plaintiff. Eventu-

---

[3] According to Reid's affidavit, the total debt secured by the mortgage as of the date of the hearing was $414,194.10, which consisted of: $359,008.69 in principal; $50,182.14 in interest from September 1, 1991 through May 14, 1993; $2303.79 in escrow payments; and $2699.48 in late charges.

[4] Reid also testified that the original promissory note executed by Mahler was missing and that she had been unable to locate it. She stated, however, that New England regularly maintained a copy of the original note in the loan collection file, which she oversaw. Through Reid, New England introduced photocopies of the first and third pages of the three page promissory note executed by Mahler. New England also introduced an uncompleted page referring to interest terms, which, Reid testified, represented the second page of the standard form used by the bank for promissory notes. The page was introduced as an example of what the missing second page to Mahler's promissory note would have looked like.

ally, the mortgage and note were assigned to Alaska Seaboard Partners Limited Partnership. See footnote 1. Subsequently, on January 25, 1994, Judge Dorsey reconsidered Bedford's motion to open the default judgment, and vacated the default judgment and the judgment of strict foreclosure. Thereafter, the case proceeded to trial as a contested foreclosure matter before Judge Silbert.

At trial, GHR requested that the court take judicial notice of the evidence presented at the hearing in damages before Judge Dorsey, including a transcript of Reid's testimony and the exhibits admitted at the hearing. Bedford objected, arguing that the transcript was hearsay and that, because GHR had not shown that Reid was unavailable to testify, the transcript could not properly be admitted. The trial court overruled the objection and took judicial notice of the transcript.[5]

GHR next called Linda Currie, an asset manager at Greenthal/Harlan Realty (Greenthal), to establish the current amount of the debt. Currie stated that GHR was a wholly owned subsidiary of Greenthal, that GHR owned the debt and mortgage at issue, and that Greenthal managed the asset on behalf of GHR. Currie testified that Citizens, pursuant to its sale of the asset, had transferred to Greenthal a file that contained certain records relating to the loan and mortgage. Additionally, she testified that Greenthal did not service the loans it managed, but used a subservicer, from whom she had obtained computer records in order to determine the current payment status of the loan.

On the basis of her review of the file and the computer records, Currie testified that Bedford had defaulted on

---

[5] Bedford further objected to the admission of photocopies of the first and third pages of the original note, the uncompleted second page, and to Reid's affidavit of debt. The trial court overruled Bedford's objections and took judicial notice of those exhibits and of a copy of the original mortgage deed.

the mortgage loan. She further testified to the outstanding principal on the loan, the interest accrued on the debt up to the date of trial from the date of default, insurance, property tax and late charges, and the total amount of the debt.[6] Bedford objected, arguing that Currie's testimony in this regard was hearsay because it was based on documents that had not been authenticated as business records and had not been admitted into evidence.[7] The trial court overruled the objection, stating that it would permit Currie to "summarize what her records reflect[ed]." On cross-examination, Currie testified that GHR had never been in possession of the original promissory note and that she had no personal knowledge of the repayment history of the loan prior to July 15, 1994. The parties stipulated that the fair market value of the property was $410,000. They further stipulated to the amount of an appraisal fee and to the amount of reasonable attorney's fees.

Bedford presented no evidence at trial. It argued that the court should deny a judgment of strict foreclosure because GHR had never been in possession of the promissory note. In this regard, Bedford contended that a party seeking to foreclose on a mortgage must also be able to enforce the promissory note, even if it is lost, in accordance with §§ 42a-3-301 and 42a-3-309. See foot-

---

[6] Currie testified that the total debt at the time of trial was $466,812.98, which consisted of: $359,008.69 in outstanding principal; $81,748.34 in interest since October, 1991; $21,594.02 in insurance and taxes; and $4461.93 in late charges.

[7] GHR did attempt to introduce into evidence one of the records on which Currie testified that she had relied, a document titled "Master Records Status Report." Currie testified that this report, which contained a loan history on which she had relied in determining the amount of the debt, had been received by Greenthal from Citizens. Bedford objected to the admission of the report on the ground that it was hearsay and that it had not been authenticated as a business record. The trial court agreed that the report had not been authenticated as a business record and admitted the report into evidence solely for the purpose of demonstrating the basis of Currie's testimony, but not for the truth of the matters asserted therein.

note 2. Bedford argued that, because GHR had not shown that it had ever possessed the lost note, a condition of enforcement of a lost instrument under § 42a-3-309, GHR was precluded from recovery in an action for strict foreclosure.

The trial court rendered a judgment of strict foreclosure in favor of GHR. In a written memorandum of decision, the trial court rejected Bedford's argument that GHR's failure to demonstrate that it had possessed the note was fatal to its action for strict foreclosure. The trial court reasoned that an action on a mortgage is separate and distinct from an action on a promissory note and, accordingly, that GHR was not required to satisfy the requirements of §§ 42a-3-301 and 42a-3-309, for the enforcement of a lost instrument. The trial court determined that GHR had "established its chain of title to the mortgage . . . [and had] proved default under the mortgage in that there had been no payments on the debt since September of 1991 . . . [and that] the original borrower, Stelle Mahler, transferred the property to Bedford without the consent of [New England] . . . [and that GHR] had proved a total debt in the amount of $466,812.98, based on the principal balance, interest, late charges, and expenses for insurance and property taxes, plus the appraisal fee of $450 and attorney's fees in the stipulated amount of $13,750, for a grand total of $481,012.98." On the basis of these findings and the parties' stipulation that the fair market value of the mortgaged property was $410,000, the trial court rendered a judgment of strict foreclosure and set law days. Bedford appealed to the Appellate Court and we transferred the appeal to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c).

On appeal, Bedford claims that the trial court improperly: (1) admitted the transcript from the hearing in damages; (2) admitted Currie's testimony concerning the amount of the debt at the time of trial; (3) alterna-

tively, concluded that New England was entitled to accelerate the mortgage debt; and (4) determined that GHR was not required to satisfy the requirements of §§ 42a-3-301 and 42a-3-309 in order to foreclose the mortgage. We agree with Bedford that the trial court improperly admitted the transcript and Currie's testimony and, on these grounds, we reverse the trial court's judgment and remand the case to the trial court for a new trial. Additionally, because it is an issue likely to resurface at the new trial, we also reach Bedford's claim that GHR was required to satisfy the Uniform Commercial Code requirements for the enforcement of a lost instrument in order to obtain strict foreclosure of the mortgage. We conclude that it was not.

I

We turn first to Bedford's claims regarding the admissibility of the evidence from Reid and Currie of the amount of the debt. It is well established that "the trial court has broad discretion in ruling on the admissibility [and relevancy] of evidence." *State* v. *Miller*, 202 Conn. 463, 482, 522 A.2d 249 (1987). "The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion." *State* v. *Avis*, 209 Conn. 290, 298, 551 A.2d 26 (1988), cert. denied, 498 U.S. 1097, 109 S. Ct. 1570, 103 L. Ed. 2d 937 (1989). Moreover, it is well settled that "before a party is entitled to a new trial because of an erroneous evidentiary ruling, he or she has the burden of demonstrating that the error was harmful." *Swenson* v. *Sawoska*, 215 Conn. 148, 153, 575 A.2d 206 (1990). "When determining that issue in a civil case, the standard to be used is whether the erroneous ruling would likely affect the result." (Internal quotation marks omitted.) Id.

Bedford first claims that the trial court improperly admitted into evidence the transcript of Reid's testi-

mony at the initial hearing in damages. Specifically, Bedford argues that the transcript constituted hearsay and, because GHR failed to demonstrate that Reid was unavailable to testify at trial, admission of the transcript was improper. GHR appears to concede that the transcript was hearsay and that the trial court, in taking judicial notice of the transcript, admitted it into evidence. GHR contends, however, that the trial court's ruling in this regard was proper because the transcript was admissible under the "catch-all," or residual exception to the hearsay rule. We agree with Bedford.[8]

"Hearsay is an out-of-court statement offered into evidence to establish the truth of the matters contained therein." (Internal quotation marks omitted.) *State* v. *Duntz*, 223 Conn. 207, 232, 613 A.2d 224 (1992). "As a general rule, hearsay evidence is not admissible unless it falls under one of several well established exceptions." *State* v. *Oquendo*, 223 Conn. 635, 664, 613 A.2d 1300 (1992). If such evidence is offered to establish the truth of statements contained therein, the burden is on the proponent of the evidence, upon timely objection, to establish that the evidence is admissible.

"The purpose behind the hearsay rule is to effectuate 'the policy of requiring that testimony be given in open court, under oath, and subject to cross-examination.' 2 C. McCormick, Evidence (4th Ed.) § 253. The 'residual,' or 'catch-all,' exception to the hearsay rule allows a trial court to admit hearsay evidence not admissible under any of the established exceptions if: (1) there is 'a reasonable necessity for the admission of the statement,' and (2) the statement is 'supported by the equivalent guarantees of reliability and trustworthiness

---

[8] Alternatively, Bedford also claims that the transcript was improperly admitted at trial because Reid's testimony at the hearing in damages itself was hearsay and, therefore, her testimony was improperly admitted at the hearing. Because we conclude that the transcript was inadmissible hearsay, we do not reach this claim.

essential to other evidence admitted under the traditional hearsay exceptions.' " *State* v. *Oquendo*, supra, 223 Conn. 664; see also *State* v. *Stepney*, 191 Conn. 233, 249–50, 464 A.2d 758 (1983), cert. denied, 465 U.S. 1084, 104 S. Ct. 1455, 79 L. Ed. 2d 772 (1984). "We have stated that 'the necessity requirement is met when, unless the hearsay statement is admitted, the facts it contains may be lost, either because the declarant is dead or otherwise unavailable, or because the assertion is of such a nature that evidence of the same value cannot be obtained from the same or other sources.' " *State* v. *Oquendo*, supra, 665; see also *State* v. *Frye*, 182 Conn. 476, 480, 438 A.2d 735 (1980) ("necessity factor . . . is reflected in the prerequisite that the declarant be unavailable"). "The moving party has the burden of proving the declarant's unavailability." *State* v. *Frye*, supra, 480.

In support of its contention that the transcript was properly admitted under the residual exception to the hearsay rule, GHR argues that: (1) admission of the transcript was necessary because New England became insolvent and, therefore, had no authorized representatives; and (2) the transcript of Reid's testimony was reliable because Reid had been under oath and subject to cross-examination by Bedford when her testimony was given. Additionally, GHR suggests that admission of the transcript was a proper exercise of the trial court's discretion because of certain "representations made at the chambers conference when the parties agreed to proceed in the absence of the judge who observed the earlier testimony." GHR argues that "[c]ombined, these factors place this evidentiary ruling within the trial court's broad discretion." We are unpersuaded.

"Even if we assume that, in this case, [Reid's] prior cross-examination establishes the reliability of [her] testimony; see *State* v. *Sharpe*, [195 Conn. 651, 665, 491 A.2d 345 (1985)]; *State* v. *Parker*, [161 Conn. 500, 504–

505, 289 A.2d 894 (1971)]; C. McCormick, supra, § 255; it was still [GHR's] burden to demonstrate its necessity by proving [her] unavailability. *State* v. *Frye*, [supra, 182 Conn. 480]; C. McCormick, supra, § 253." *State* v. *Aillon*, 202 Conn. 385, 391, 521 A.2d 555 (1987). "The most common forms of unavailability are those set out in rule 804 (a) of the Federal Rules of Evidence . . . [including situations in which]: (1) when the court has determined that the witness has a testimonial privilege; (2) the witness persists in refusing to testify despite a court order to do so; (3) the witness has a lack of memory; (4) the witness is unable to be present or testify because of death or existing physical or mental illness or infirmity; and (5) the witness is absent from the hearing and the proponent of his statement has been unable to procure his attendance . . . [or testimony] by process or other reasonable means. . . . *State* v. *Frye*, [supra, 481]; *State* v. *Rivera*, 221 Conn. 58, 61, 602 A.2d 571 (1992) . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Munoz*, 233 Conn. 106, 140, 659 A.2d 683 (1995).

GHR provides no support for the proposition that an employee of a business entity is necessarily unavailable to give testimony concerning the business' transactions and records whenever the business has become insolvent. Further, "[s]o far as the record shows, [GHR] made no attempt whatsoever to secure [Reid's] physical presence so that [s]he might personally advise the court as to [her] present inability, or unwillingness, to testify [as to the amount of the debt as of the date of the hearing in damages]. 'Due diligence to procure the attendance of the absent witness [is] . . . an essential . . . predicate of unavailability.' " *State* v. *Aillon*, supra, 202 Conn. 391. Absent evidence of "a good faith effort to procure [Reid's] attendance"; id., 392; or a factual demonstration on the record to prove that she actually could or would not testify as to the amount of the debt as of the date

on the hearing in damages, we cannot say that GHR satisfied its burden of proving her unavailability. See id., 391–92.[9]

We are also unable to find support in the record for GHR's suggestion that Bedford agreed to, or waived its right to object to, the admission at trial of evidence presented at the previously terminated hearing in damages. In support of this suggestion, GHR emphasizes a reference by the trial court to the agreement of the parties, apparently voiced in chambers, that the case could be heard by Judge Silbert and that it was not necessary to return the case to Judge Dorsey. We have noted that "[w]aiver does not have to be express, but may consist of acts or conduct from which waiver may be implied. . . . In other words, waiver may be inferred from the circumstances if it is reasonable to do so." (Citations omitted; internal quotation marks omitted.) *Stewart* v. *Tunxis Service Center*, 237 Conn. 71, 80–81, 676 A.2d 819 (1996). There is, however, neither a stipulation as to the admissibility of evidence from the prior hearing nor an agreement on the record regarding the same. Furthermore, the record indicates that Bedford vigorously contested both the admissibility of such evidence at trial and any suggestion that its agreement to have the case tried by Judge Silbert constituted agreement to the admissibility of evidence presented at the prior hearing. In the absence of some reflection

---

[9] As Bedford notes, the transcript of Reid's testimony at the prior hearing constitutes former testimony, which is a specific category of exception to the hearsay rule. See *State* v. *Torres*, 210 Conn. 631, 645–46, 556 A.2d 1013 (1989); *State* v. *Parker*, supra, 161 Conn. 503–504; C. Tait & J. LaPlante, Connecticut Evidence (2d Ed. 1988) § 11.4.1, p. 325. Under this exception, however, the admissibility of such evidence is predicated on the unavailability of the declarant. *Crochiere* v. *Board of Education*, 227 Conn. 333, 356, 630 A.2d 1027 (1993); *State* v. *Aillon*, supra, 202 Conn. 391. Because we conclude that GHR failed to demonstrate that Reid was unavailable, we agree with Bedford that the requirements of this hearsay exception were not satisfied.

in the record of a waiver of Bedford's objection to such evidence, we cannot presume that Bedford agreed to the admission of the evidence. Accordingly, we conclude that the trial court improperly admitted the transcript of Reid's testimony.

Bedford next claims that the trial court improperly admitted the testimony of Currie concerning the amount of the outstanding debt. Specifically, Bedford argues that Currie did not have personal knowledge of the documents on which she relied to determine the amount of the debt and, because GHR did not introduce into evidence the documents on which Currie relied, her testimony in this regard was hearsay.[10] GHR argues that Currie's testimony was properly admitted pursuant to *American Oil Co.* v. *Valenti*, 179 Conn. 349, 426 A.2d 305 (1979). We agree with Bedford.

As we stated previously, "[h]earsay is an out-of-court statement offered into evidence to establish the truth of the matters contained therein." (Internal quotation marks omitted.) *State* v. *Duntz*, supra, 223 Conn. 232. In the absence of personal knowledge about the contents of a document, a witness' statements about the document are hearsay. See *Central Bank* v. *Colonial Romanelli Associates*, 38 Conn. App. 575, 579–80, 662 A.2d 157 (1995); 2 C. McCormick, supra, § 247, p. 245.

At trial, Currie admitted on cross-examination that her knowledge of the debt was based exclusively on what she had gleaned from the file that Citizens had transferred to GHR and from the computer records. Currie testified, on the basis of her review of those documents, that Mahler had defaulted on the loan by failing to make payments since 1991, and that New England had not given its consent to Mahler's transfer

---

[10] Alternatively, Bedford also claims that Currie's testimony was admitted contrary to the best evidence rule. Because we conclude that Currie's testimony was inadmissible hearsay, we do not reach that claim.

of the mortgaged property to Bedford. She also testified as to the amount of the debt as of the date of trial. Currie had no personal knowledge concerning the terms or status of the debt, since she had not closed or serviced the note and mortgage, and since GHR had employed a subservicer to make collections. Furthermore, at trial, GHR did not tender any explanation for why it did not produce the actual file or other documents on which Currie had relied. Because Currie did not have personal knowledge of the contents of the file, her testimony was inadmissible hearsay.

GHR relies on *American Oil Co.* v. *Valenti*, supra, 179 Conn. 349, to support its contention that Currie's testimony was properly admitted. *Valenti*, however, is inapposite. In *Valenti*, a surety on a promissory note challenged the foundation necessary for a trial court to admit computer records into evidence. Id., 357. Thus, GHR's reliance on *Valenti* is unwarranted in the context of this case, because GHR did not offer into evidence as business records the documents on which Currie relied. Moreover, GHR did not offer Currie's testimony for the limited purpose of laying a foundation for the entry of the documents into evidence but, rather, as evidence of the debt. Currie's testimony concerning the amount of the debt was, therefore, improperly admitted.

GHR does not dispute that, in the absence of either the transcript of Reid's testimony or Currie's testimony, there was not sufficient competent evidence from which the trial court could properly determine the amount of the debt. We need not decide, therefore, whether either of the challenged evidentiary rulings individually was harmful because, in conjunction, the rulings necessarily were harmful to Bedford. Accordingly, we reverse the trial court's judgment of strict foreclosure.

## II

We turn next to Bedford's contention that the trial court improperly determined that GHR was not precluded from obtaining a judgment of strict foreclosure by §§ 42a-3-301 and 42a-3-309. See footnote 2. In this regard, Bedford argues that, if the promissory note is lost, a mortgagee can foreclose only if it satisfies the conditions set forth in § 42a-3-309, which require the party seeking to enforce a lost note to show that he or she was in possession of the note at the time it was lost. Bedford maintains that, since GHR never proved it possessed the original note and thus cannot satisfy § 42a-3-309, GHR cannot obtain a judgment of strict foreclosure. We disagree.

Bedford's argument is founded upon the premise that an action to foreclose a mortgage and an action to enforce a note are inextricably linked. "It is well established [however] that the [mortgagee] is entitled to pursue its remedy at law on the notes, or to pursue its remedy in equity upon the mortgage, or to pursue both. A note and a mortgage given to secure it are separate instruments, executed for different purposes and in this State action for foreclosure of the mortgage and upon the note are regarded and treated, in practice, as separate and distinct causes of action, although both may be pursued in a foreclosure suit." (Internal quotation marks omitted.) *Hartford National Bank & Trust Co.* v. *Kotkin*, 185 Conn. 579, 581, 441 A.2d 593 (1981); see also *First Bank* v. *Simpson*, 199 Conn. 368, 372, 507 A.2d 997 (1986). Bedford does not dispute that a note and a mortgage were executed and that the underlying debt exists. GHR is seeking to enforce a debt, evidenced by a promissory note, through the equitable remedy of foreclosure. "The mortgage secures the indebtedness itself, not the written evidence of it." G. Osborne, Mortgages (2d Ed. 1970) § 105. Because GHR has chosen to pursue the equitable action of foreclosure of the

mortgage, rather than a legal action on the note, the fact that GHR never possessed the lost promissory note is not fatal to its foreclosure of the mortgage. Moreover, GHR has not sought a deficiency judgment. Thus, whatever restrictions §§ 42a-3-301 and 42a-3-309 might put upon the enforcement of personal liability based solely upon a lost note, they do not prohibit GHR from pursuing an action of foreclosure to enforce the terms of the mortgage.

In pursuing the remedy of strict foreclosure, GHR or its assignee nevertheless will have to establish the amount of the debt that Bedford owes. The loss of the note, however, does not preclude proof of the debt by other evidence. " 'A bill or note is not a debt; it is only primary evidence of a debt; and where this is lost, impaired or destroyed bona fide, it may be supplied by secondary evidence.' *Bank of United States* v. *Sill*, 5 Conn. 106, 111 [1823]. 'The loss of a bill or note alters not the rights of the owner, but merely renders secondary evidence necessary and proper.' *Hinsdale* v. *Miles*, 5 Conn. 331, 334 [1824]; *Almy* v. *Reed*, 64 Mass. (10 Cush.) 421, 425 [1852]." *Goslee* v. *Rowe*, 114 Conn. 1, 6, 157 A. 267 (1931). GHR or its assignee is free to present reliable evidence other than the original promissory note to establish the amount of the debt.

The judgment is reversed and the case is remanded to the trial court for a new trial.

In this opinion the other justices concurred.